(Slip Opinion)        OCTOBER TERM, 2022        1

NOTE: Where it is feasible, a syllabus (headnote) will be released, as is being done in connection with this case, at the time the opinion is issued. The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See *United States* v. *Detroit Timber & Lumber Co.,* 200 U. S. 321, 337.

# SUPREME COURT OF THE UNITED STATES

Syllabus

## AXON ENTERPRISE, INC. *v.* FEDERAL TRADE COMMISSION ET AL.

### CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

No. 21–86.  Argued November 7, 2022—Decided April 14, 2023*

Michelle Cochran and Axon Enterprise, Inc.—respondents in separate enforcement actions initiated in the Securities and Exchange Commission (SEC) and the Federal Trade Commission (FTC)—each filed suit in federal district court challenging the constitutionality of the agency proceedings against them.  When, as in the enforcement actions against Cochran and Axon, a Commission elects to institute administrative proceedings to address statutory violations, it typically delegates the initial adjudication to an Administrative Law Judge (ALJ) with authority to resolve motions, hold a hearing, and then issue a decision.  As prescribed by statute, a party objecting to the Commission proceedings makes its claims first within the Commission itself, and then (if needed) in a federal court of appeals.  But the parties here sidestepped that review scheme and brought their claims in district court, seeking to enjoin the administrative proceedings.  Cochran and Axon asserted that the tenure protections of the agencies' ALJs render them insufficiently accountable to the President, in violation of separation-of-powers principles.  Axon also attacked as unconstitutional the combination of prosecutorial and adjudicatory functions in the FTC.  Each suit premised jurisdiction on district courts' ordinary federal-question authority to resolve "civil actions arising under the Constitution, laws, or treaties of the United States." 28 U. S. C. §1331.

Cochran's and Axon's suits initially met the same fate: dismissal for lack of jurisdiction.  The district court in Cochran's case held that the

——————

*Together with No. 21–1239, *Securities and Exchange Commission et al.* v. *Cochran*, on certiorari to the United States Court of Appeals for the Fifth Circuit.

review scheme specified in the Securities Exchange Act—"administrative review followed by judicial review in a federal court of appeals"—"implicitly divest[s] district courts of jurisdiction" over "challenges to SEC proceedings," including Cochran's constitutional ones. Likewise, the district court in Axon's case found that the FTC Act's comparable review scheme displaces §1331 jurisdiction for claims concerning the FTC's adjudications. On appeal, the Ninth Circuit affirmed the district court's dismissal of Axon's constitutional challenges to the FTC proceeding, concluding that the claims were the type that fell within the FTC Act's review scheme. But the en banc Fifth Circuit disagreed as to the equivalent SEC question, finding that Cochran's claim would not receive "meaningful judicial review" in a court of appeals; that the claim was "wholly collateral to the Exchange Act's statutory-review scheme"; and that the claim fell "outside the SEC's expertise."

*Held*: The statutory review schemes set out in the Securities Exchange Act and Federal Trade Commission Act do not displace a district court's federal-question jurisdiction over claims challenging as unconstitutional the structure or existence of the SEC or FTC. Pp. 7–18.

(a) Although district courts may ordinarily hear challenges to federal agency actions by way of §1331's jurisdictional grant for claims "arising under" federal law, Congress may substitute an alternative review scheme. In both the Exchange Act and the FTC Act, Congress did so: It provided for review of claims about agency action in a court of appeals following the agency's own review process. The creation of such a review scheme divests district courts of their ordinary jurisdiction over covered cases. But the statutory scheme does not necessarily extend to every claim concerning agency action. See, *e.g.*, *Thunder Basin Coal Co.* v. *Reich*, 510 U. S. 200, 207–213. This Court has identified three considerations—commonly known as the *Thunder Basin* factors—to determine whether particular claims concerning agency action are "of the type Congress intended to be reviewed within th[e] statutory structure." *Id.*, at 212. First, could precluding district court jurisdiction "foreclose all meaningful judicial review" of the claim? *Id.*, at 212–213. Next, is the claim "wholly collateral" to the statute's review provisions? *Id*, at 212. And last, is the claim "outside the agency's expertise"? *Ibid.*

The Court has twice held specific claims to fit within a statutory review scheme, based on the *Thunder Basin* factors. In *Thunder Basin* itself, a coal company subject to the Mine Act filed suit in district court instead of asserting its claims—as a statutory scheme prescribed—first before a mine safety commission and then (if needed) a court of appeals. The crux of the dispute concerned the company's refusal to provide employee-designated union officials with access to the workplace in accordance with the Mine Act. The company also objected on

due process grounds to the agency's imposition of a fine before holding a hearing. See 510 U. S., at 205. The Court held that the district court lacked jurisdiction over those claims, emphasizing the commission's "extensive experience" in addressing the statutory issues raised, as well as its ability to resolve them in light of its "expertise" over the mining industry. *Id.,* at 214–215. The Court acknowledged the company's constitutional challenge was less tied to the agency's experience and expertise, but concluded it could be "meaningfully addressed in the Court of Appeals." *Id.*, at 215.

The Court applied similar reasoning in *Elgin* v. *Department of Treasury*, 567 U. S. 1, which involved a statutory review scheme that directed federal employees challenging discharge decisions to seek review in the Merit Systems Protection Board (MSPB) and then, if needed, in the Federal Circuit. Elgin filed suit in district court when the government fired him for failing to register for the draft. This Court held that the district court lacked jurisdiction even though Elgin mainly claimed that the draft's exclusion of women violated the Equal Protection Clause. Although the MSPB might not be able to hold the draft law unconstitutional, the Court of Appeals could—and that was sufficient to ensure "meaningful review" of Elgin's claim. *Id.*, at 21. Further, Elgin's challenge to his discharge was neither collateral to the MSPB's ordinary proceedings nor unrelated to its expertise in the employment context.

In contrast, the Court in *Free Enterprise Fund* applied the *Thunder Basin* factors to determine that an accounting firm's Article II challenge to the structure of the Public Company Accounting Oversight Board—an agency regulating the accounting industry under the SEC's oversight—landed *outside* the Exchange Act's review scheme. Because not all Board action culminates in Commission action—which alone the statute makes reviewable in a court of appeals—the Court determined that the Exchange Act provided no "meaningful avenue of relief." 561 U. S., at 490–491. And even if the SEC took up a matter arising from the Board's investigation of the firm, the firm's constitutional challenge to the Board's existence would be "collateral" to the subject of that proceeding, as well as "outside the Commission's competence and expertise." *Ibid.* Pp. 7–10.

(b) The Court must decide if the constitutional claims here are "of the type" Congress thought belonged within a statutory review scheme. *Thunder Basin*, 510 U. S., at 212. Like the accounting firm in *Free Enterprise Fund*, Cochran and Axon assert sweeping constitutional claims: They charge that the SEC and FTC are wielding authority unconstitutionally in all or broad swaths of their work. Applying the *Thunder Basin* factors here, the Court comes out in the same place as in *Free Enterprise Fund*.

First, preclusion of district court jurisdiction "could foreclose all meaningful judicial review." *Id.,* at 212–13. Adequate judicial review does not usually demand a district court's involvement. And the statutes at issue in this case provide for judicial review of adverse SEC and FTC actions in a court of appeals. But Cochran and Axon assert a "here-and-now injury" from being subjected to an illegitimate proceeding, led by an illegitimate decisionmaker. *Seila Law LLC* v. *Consumer Financial Protection Bureau*, 591 U. S. ___, ___. That injury is impossible to remedy once the proceeding is over, which is when appellate review kicks in. Judicial review of the structural constitutional claims would thus come too late to be meaningful. To be sure, "the expense and disruption" of "protracted adjudicatory proceedings" on a claim do not alone justify immediate review. *FTC* v. *Standard Oil Co. of Cal.*, 449 U. S. 232, 244. But the nature of the injury here is different: As with a right "not to stand trial" that is "effectively lost" if review is deferred until after trial, see *Mitchell* v. *Forsyth*, 472 U. S. 511, 526, Axon and Cochran will lose their rights not to undergo the complained-of agency proceedings if they cannot assert those rights until the proceedings are over.

The collateralism factor also favors Axon and Cochran. The challenges to the Commissions' authority have nothing to do with either the enforcement-related matters the Commissions regularly adjudicate or those they would adjudicate in assessing the charges against Axon and Cochran. *Elgin*, 567 U. S., at 22. The parties' claims are thus "'collateral' to any Commission orders or rules from which review might be sought." *Free Enterprise Fund*, 561 U. S., at 490.

Finally, Cochran's and Axon's claims are "outside the [Commissions'] expertise." *Thunder Basin*, 510 U. S., at 212. The Court in *Free Enterprise Fund* determined that claims that tenure protections violate Article II raise "standard questions of administrative" and constitutional law, detached from "considerations of agency policy." 561 U. S., at 491. That statement covers Axon's and Cochran's claims that ALJs are too far insulated from the President's removal authority. And Axon's constitutional challenge to the combination of prosecutorial and adjudicative functions in the FTC is similarly distant from the FTC's "competence and expertise." *Ibid.* The Commission knows a good deal about competition policy, but nothing special about the separation of powers. For that reason, "agency adjudications are generally ill suited to address structural constitutional challenges"—like those maintained here. *Carr* v. *Saul*, 593 U. S. ___, ___. The Court concludes that the claims here are not the type the statutory review schemes at issue reach. Pp. 10–18.

No. 21–86, 986 F. 3d 1173, reversed and remanded; No. 21–1239, 20 F. 4th 194, affirmed and remanded.

Syllabus

KAGAN, J., delivered the opinion of the Court, in which ROBERTS, C.J., and THOMAS, ALITO, SOTOMAYOR, KAVANAUGH, BARRETT and JACKSON, JJ., joined. THOMAS, J., filed a concurring opinion. GORSUCH, J., filed an opinion concurring in the judgment.

NOTICE: This opinion is subject to formal revision before publication in the preliminary print of the United States Reports. Readers are requested to notify the Reporter of Decisions, Supreme Court of the United States, Washington, D. C. 20543, of any typographical or other formal errors, in order that corrections may be made before the preliminary print goes to press.

# SUPREME COURT OF THE UNITED STATES

Nos. 21–86 and 21–1239

AXON ENTERPRISE, INC., PETITIONER
21–86                         *v.*
FEDERAL TRADE COMMISSION, ET AL.

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF
APPEALS FOR THE NINTH CIRCUIT

SECURITIES AND EXCHANGE COMMISSION, ET AL.,
PETITIONERS
21–1239                       *v.*
MICHELLE COCHRAN

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF
APPEALS FOR THE FIFTH CIRCUIT

[April 14, 2023]

JUSTICE KAGAN delivered the opinion of the Court.

In each of these two cases, the respondent in an administrative enforcement action challenges the constitutional authority of the agency to proceed. Both respondents claim that the agencies' administrative law judges (ALJs) are insufficiently accountable to the President, in violation of separation-of-powers principles. And one respondent attacks as well the combination of prosecutorial and adjudicatory functions in a single agency. The challenges are fundamental, even existential. They maintain in essence that the agencies, as currently structured, are unconstitutional in much of their work.

Our task today is not to resolve those challenges; rather, it is to decide where they may be heard. The enforcement actions at issue were initiated in the Securities and Exchange Commission (SEC) and the Federal Trade Commission (FTC). Most objections to those Commissions' proceedings follow a well-trod path. As prescribed by statute, a party makes its claims first within the Commission itself, and then (if needed) in a federal court of appeals. The parties here, however, sidestepped that review scheme. Seeking to stop the administrative proceedings, they instead brought their claims in federal district court. The question presented is whether the district courts have jurisdiction to hear those suits—and so to resolve the parties' constitutional challenges to the Commissions' structure. The answer is yes. The ordinary statutory review scheme does not preclude a district court from entertaining these extraordinary claims.

I

Congress established the SEC to protect investors in securities markets, and created the FTC to promote fair competition. The Commissions enforce, respectively, the Securities Exchange Act and the FTC Act (among other laws). See 15 U. S. C. §78a *et seq.* (Exchange Act); 15 U. S. C. §41 *et seq.* (FTC Act). Those Acts authorize the Commissions to address statutory violations either by bringing civil suits in federal district court or by instituting their own administrative proceedings. See §§78u(d), 78u–1, 78u–2, 78u–3; §§45(b), (m).

When a Commission elects the latter option—as in these two cases—it typically delegates the initial adjudication to an ALJ. See §78d–1(a); note following §41. To foster independence, each Commission's ALJs are removable "only for good cause" as determined by the Merit Systems Protection Board (MSPB)—a separate agency whose members are themselves removable by the President only for cause, such

as "neglect of duty" or "malfeasance." 5 U. S. C. §§7521(a), 1202(d). An ALJ assigned to hear an SEC or FTC enforcement action has authority, much like a regular trial judge, to resolve motions, hold a hearing, and then issue a decision. See 16 CFR §§3.21–3.56 (2021); 17 CFR §§201.221–201.360 (2021).

A losing party may appeal the ALJ's ruling to the Commission; alternatively, the Commission may undertake review on its own initiative. See 16 CFR §§3.52–3.53; 17 CFR §§201.410–201.411. Upon completion of internal review, the Commission enters a final decision. See 16 CFR §3.54; 17 CFR §201.411(a). Or if no such review has occurred, the ALJ's ruling itself becomes the decision of the Commission. See 15 U. S. C. §78d–1(c); 16 CFR §3.51(a).

The Exchange Act and FTC Act both provide for review of a final Commission decision in a court of appeals, rather than a district court. Under the Exchange Act, "[a] person aggrieved by [an SEC] final order . . . may obtain review of the order" by filing a petition in a court of appeals. 15 U. S. C. §78y(a)(1). That petition gives the appellate court "jurisdiction" to "affirm or modify and enforce or to set aside the order in whole or in part." §78y(a)(3). The FTC Act similarly provides that the party subject to an FTC order may "obtain a review of such order" in a court of appeals, and grants the court "jurisdiction" to "affirm[], modify[], or set[] aside the order." §45(c).

The cases before us, though, did not take the above-described course. In each, the respondent in an administrative enforcement action sued in district court prior to an ALJ decision, seeking to enjoin the Commission's proceeding. Each suit charged that some fundamental aspect of the Commission's structure violates the Constitution; that the violation made the entire proceeding unlawful; and that being subjected to such an illegitimate proceeding causes legal injury (independent of any rulings the ALJ might make). Finally, each suit premised jurisdiction on district

courts' ordinary federal-question authority—their power, under 28 U. S. C. §1331, to resolve "civil actions arising under the Constitution, laws, or treaties of the United States." We describe the two cases in turn, but what we have just said they have in common is really all it is necessary to know.

The first case arises from an SEC enforcement action brought against Michelle Cochran, a certified public accountant. In an earlier round of that proceeding, an ALJ found that Cochran had failed to comply with auditing standards, in violation of the Exchange Act. But soon after that decision issued, this Court held that the SEC's ALJs had been improperly appointed. See *Lucia* v. *SEC*, 585 U. S. \_\_\_, \_\_\_ (2018). In compliance with that ruling, the SEC ordered a fresh hearing, conducted by a now validly appointed ALJ. That was the last straw for Cochran. Before the new ALJ hearing began, she sued the Commission in federal district court, asserting jurisdiction under §1331. Cochran's complaint focused on the two layers of tenure protection all ALJs hold: By statute, those officials may be removed only "for good cause as determined by the [MSPB], whose members themselves can only be removed by the President for good cause." App. 60; see *supra*, at 2. That arrangement, Cochran asserted, so greatly insulates ALJs from presidential supervision as to violate the separation of powers—more specifically, Article II's vesting of executive power in the President. See App. 53–54, 60–62. And because that was true (Cochran continued), ALJs could not constitutionally exercise power: They could neither hold any hearings nor make any decisions. Cochran thus sought declaratory and injunctive relief freeing her of the obligation "to submit to an unconstitutional proceeding." *Id.*, at 60; see *id.*, at 64.

The second case arises from an FTC enforcement action against Axon Enterprise, a company that makes and sells policing equipment. In its complaint, the FTC alleged that

Axon's purchase of its closest competitor violated the FTC Act's ban on unfair methods of competition. To stop the FTC from pursuing that charge, Axon did just what Cochran had—brought suit against the Commission in district court, premised on federal-question jurisdiction. Like Cochran, Axon asserted that the Commission's ALJs could not constitutionally exercise governmental authority because of their dual-layer protection from removal. In addition, Axon claimed that the combination of prosecutorial and adjudicative functions in the Commission renders all of its enforcement actions unconstitutional. See Complaint in No. 2:20–cv–00014 (D Ariz.), ECF Doc. 1, p. 26 (protesting that "the FTC will act as prosecutor, judge, and jury"). Again similarly to Cochran, Axon asked the court to enjoin the FTC "from subjecting" it to the Commission's "unfair and unconstitutional internal forum." *Id.*, at 7; see *id.*, at 28.[1]

Cochran's and Axon's suits met an identical fate in district court: dismissal for lack of jurisdiction. The district court in Cochran's case held that the review scheme specified in the Exchange Act—"administrative review followed by judicial review in a federal court of appeals"—"implicitly divest[s] district courts of jurisdiction" over "challenges to SEC proceedings," including Cochran's constitutional ones. App. to Pet. for Cert. in No. 21–1239, p. 141a. Likewise, the

––––––––––

[1] In this Court, Axon contends that it separately objected to "the uncodified, black-box 'clearance' process" used to determine whether the FTC or the Department of Justice will investigate a merger. Brief for Axon 13. We do not read the complaint that way. In count I, Axon raised the combination-of-functions claim; in count II, it raised the removal claim; and in count III, it asserted the view (not at issue here) that it did not violate the antitrust laws. See Complaint in No. 2:20–cv–00014 (D Ariz.), pp. 26–28. The single paragraph criticizing the clearance process appears only as background to Axon's dual constitutional claims. Accord, 986 F. 3d 1173, 1181, n. 3 (CA9 2021) (case below) (noting that the three claims Axon pushed on appeal "do not line up with" Axon's complaint). We therefore do not address the clearance-process issue.

district court in Axon's case found that the FTC Act's comparable review scheme displaces §1331 jurisdiction for claims concerning the FTC's adjudications. So Axon had to raise its structural constitutional claims "during the administrative process and then renew them" if and when "seeking review in the Court of Appeals." App. to Pet. for Cert. in No. 21–86, pp. 50–51.

On appeal from those decisions, the United States Courts of Appeals for the Fifth and Ninth Circuits split. The Ninth Circuit, considering Axon's case, reached the same conclusion as the district courts. See 986 F. 3d 1173 (2021). Reviewing this Court's precedents, the Ninth Circuit acknowledged that a statutory review scheme precluding district court jurisdiction—like the FTC Act's—might not extend to every "type of claim[]." *Id.*, at 1187 (citing *Thunder Basin Coal Co.* v. *Reich*, 510 U. S. 200, 212 (1994)). But the court decided that Axon's constitutional challenges fell within the FTC Act's scheme, mainly because the scheme guaranteed them "meaningful judicial review." 986 F. 3d, at 1181, 1187. The en banc Fifth Circuit disagreed as to the equivalent SEC question. See 20 F. 4th 194 (2021). The court maintained that "Cochran's removal power claim is not the type of claim Congress intended to funnel through the Exchange Act's statutory-review scheme." *Id.*, at 206–207 (also citing *Thunder Basin*, 510 U. S., at 212). Drawing on considerations identified in this Court's opinions, the Fifth Circuit reasoned that Cochran's claim would not receive "meaningful judicial review" in a court of appeals; that the claim was "wholly collateral to the Exchange Act's statutory-review scheme"; and that the claim fell "outside the SEC's expertise." 20 F. 4th, at 207–208.

We granted certiorari in both cases to resolve the division. 595 U. S. ___ (2022); 596 U. S. ___ (2022). We now conclude that the review schemes set out in the Exchange Act and the FTC Act do not displace district court jurisdiction over Axon's and Cochran's far-reaching constitutional

claims.

## II
### A

A special statutory review scheme, this Court has recognized, may preclude district courts from exercising jurisdiction over challenges to federal agency action. See, *e.g.*, *Thunder Basin*, 510 U. S., at 207. District courts may ordinarily hear those challenges by way of 28 U. S. C. §1331's grant of jurisdiction for claims "arising under" federal law. Congress, though, may substitute for that district court authority an alternative scheme of review. Congress of course may do so explicitly, providing in so many words that district court jurisdiction will yield. But Congress also may do so implicitly, by specifying a different method to resolve claims about agency action. The method Congress typically chooses is the one used in both the Exchange Act and the FTC Act: review in a court of appeals following the agency's own review process. We have several times held that the creation of such a review scheme for agency action divests district courts of their ordinary jurisdiction over the covered cases. See *Thunder Basin*, 510 U. S., at 207–212; *Elgin* v. *Department of Treasury*, 567 U. S. 1, 10–15 (2012); see also *Free Enterprise Fund* v. *Public Company Accounting Oversight Bd.*, 561 U. S. 477, 489 (2010) (noting that statutory schemes for agency review "[g]enerally" are "exclusive"). The agency effectively fills in for the district court, with the court of appeals providing judicial review.

But a statutory review scheme of that kind does not necessarily extend to every claim concerning agency action. Our decision in *Thunder Basin* made that point clear. After finding that Congress's creation of a "comprehensive review process" like the ones here ousted district courts of jurisdiction, the Court asked another question: whether the particular claims brought were "of the type Congress intended to be reviewed within this statutory structure." 510 U. S., at

208, 212. The Court identified three considerations designed to aid in that inquiry, commonly known now as the *Thunder Basin* factors. First, could precluding district court jurisdiction "foreclose all meaningful judicial review" of the claim? *Id.*, at 212–213. Next, is the claim "wholly collateral to [the] statute's review provisions"? *Id.*, at 212 (internal quotation marks omitted). And last, is the claim "outside the agency's expertise"? *Ibid.* When the answer to all three questions is yes, "we presume that Congress does not intend to limit jurisdiction." *Free Enterprise Fund*, 561 U. S., at 489. But the same conclusion might follow if the factors point in different directions. The ultimate question is how best to understand what Congress has done— whether the statutory review scheme, though exclusive where it applies, reaches the claim in question. The first *Thunder Basin* factor recognizes that Congress rarely allows claims about agency action to escape effective judicial review. See, *e.g.*, *Bowen* v. *Michigan Academy of Family Physicians*, 476 U. S. 667, 670 (1986). The second and third reflect in related ways the point of special review provisions—to give the agency a heightened role in the matters it customarily handles, and can apply distinctive knowledge to.

This Court has twice held specific claims to fit within a statutory review scheme, based on the *Thunder Basin* factors. In *Thunder Basin* itself, a coal company subject to the Mine Act filed suit in district court instead of asserting its claims—as a statutory scheme prescribed—before a mine safety commission and then (if needed) a court of appeals. The crux of the dispute concerned the company's refusal to provide employee-designated union officials with access to the workplace, as the Mine Act apparently required. The company claimed a right to exclude the officials under another statute; it also objected on due process grounds to the agency's imposing a fine before holding a hearing. See 510 U. S., at 205; see also *Elgin*, 567 U. S., at 17, n. 6. We held

the district court to lack jurisdiction over those claims, and thus directed the company back to the statutory review scheme. The Commission, we emphasized, had "extensive experience" in addressing the statutory issues raised, and could resolve them in ways that "brought to bear" its "expertise" over the mining industry. 510 U. S*.,* at 214–215; see *Free Enterprise Fund*, 561 U. S., at 491. All that was less so, we acknowledged, of the company's constitutional challenge; but that claim could be "meaningfully addressed in the Court of Appeals." 510 U. S., at 215.

We applied similar reasoning in *Elgin.* The statutory review scheme there directed federal employees challenging discharge decisions to seek review in the MSPB and then, if needed, in the Federal Circuit (a specific court of appeals). But Elgin filed suit in district court when he was fired by the government for failing to register for the draft. We held that the court lacked jurisdiction even though Elgin mainly claimed that the draft law, in excluding women, violated the Equal Protection Clause. Although the MSPB might not be able to hold the draft law unconstitutional, we stated, the Court of Appeals could—and that was sufficient to ensure "meaningful review" of Elgin's claim. 567 U. S., at 21. Still more, Elgin's claim was neither collateral to the MSPB's ordinary proceedings nor unrelated to its expertise. We reasoned that a "challenge to [a discharge] is precisely the type of personnel action regularly adjudicated by the MSPB." *Id.*, at 22. And we observed that such an action could involve "threshold" and other "questions unique to the employment context" that "fall[] squarely within the MSPB's expertise." *Id.*, at 22–23.

But in *Free Enterprise Fund*, this Court went the opposite way, holding that certain claims landed *outside* a statutory review scheme. The scheme was the Exchange Act's—the same as in Cochran's case. And the main claim in *Free Enterprise Fund* bears more than a passing resemblance to one Axon and Cochran raise: It, too, alleged that officials with

two layers of tenure protection were unconstitutionally insulated from presidential control.  The officials challenged, though, were different.  They were members of the Public Company Accounting Oversight Board—an agency regulating the accounting industry under the SEC's oversight. When the Board opened an investigation of an accounting firm's auditing practices, the firm took its Article II claim to district court.  This time we held that the court had jurisdiction of the action, based on the *Thunder Basin* factors. We found that the Exchange Act provided no "meaningful avenue of relief" for the firm, given the separation between the Board and the Commission.  561 U. S., at 490–491 (internal quotation marks omitted).  Not every Board action, we explained, culminates in Commission action—which alone the statute makes reviewable in a court of appeals. And even supposing the SEC took up a matter arising from the Board's investigation, the firm's constitutional challenge would be "collateral" to the subject of that proceeding. The firm, we observed, "object[s] to the Board's existence, not to any of its auditing standards."  *Id.*, at 490.  Finally, we held, the firm's claim was "outside the Commission's competence and expertise."  *Id.*, at 491.  It raised only a "standard" issue of administrative and constitutional law, relating not at all to "considerations of agency policy." *Ibid.* (internal quotation marks and alterations omitted).

B

One way of framing the question we must decide is whether the cases before us are more like *Thunder Basin* and *Elgin* or more like *Free Enterprise Fund*.  The answer appears from 30,000 feet not very hard.  Recall our task: to decide if a claim is "of the type" Congress thought belonged within a statutory scheme.  *Thunder Basin*, 510 U. S., at 212.  The claims here are of the same ilk as the one in *Free Enterprise Fund*.  There, the complaint alleged that the

Board's "freedom from Presidential oversight" rendered unconstitutional "all power and authority [the Board] exercised." 561 U. S., at 508 (internal quotation marks omitted). Only the Court's ability to sever the relevant statute's for-cause removal provision enabled the Board to keep running. See *ibid.* The Article II challenges in Axon's and Cochran's cases would likewise prevent ALJs—through whom the Commissions do much of their work—from exercising any power, unless they lose their double-for-cause tenure protection. And Axon's combination-of-functions claim similarly goes to the core of the FTC's existence, given that the agency indeed houses (and by design) both prosecutorial and adjudicative activities. The challenges here, as in *Free Enterprise Fund*, are not to any specific substantive decision—say, to fining a company (*Thunder Basin*) or firing an employee (*Elgin*). Nor are they to the commonplace procedures agencies use to make such a decision. They are instead challenges, again as in *Free Enterprise Fund*, to the structure or very existence of an agency: They charge that an agency is wielding authority unconstitutionally in all or a broad swath of its work. Given that equivalence, it would be surprising to treat the claims here differently from the one in *Free Enterprise Fund*—which we held belonged in district court.

And when we apply the *Thunder Basin* factors, we indeed come out in the same place as *Free Enterprise Fund*. Our reasoning differs in some particulars, reflecting variations between that case and the two here. But the 30,000-foot view of the issue before us ends up a good proxy for the more granular one. Each of the three *Thunder Basin* factors signals that a district court has jurisdiction to adjudicate Axon's and Cochran's (like the accounting firm's) sweeping constitutional claims.

We begin with the factor whose application here is least straightforward: whether preclusion of district court jurisdiction "could foreclose all meaningful judicial review."

*Thunder Basin*, 510 U. S., at 212–213. *Thunder Basin* and *Elgin* both make clear that adequate judicial review does not usually demand a district court's involvement. Review of agency action in a court of appeals can alone "meaningfully address[]" a party's claims. *Thunder Basin*, 510 U. S., at 215; see *Elgin*, 567 U. S., at 21 (holding that Congress provided "meaningful review" in authorizing the Federal Circuit "to consider and decide petitioners' constitutional claims").[2]  Still more, we agree with the Government that the reason *Free Enterprise Fund* gave for departing from *Thunder Basin* and *Elgin* on the judicial review issue does not apply to the cases before us. See Brief for Federal Parties 39–40. As just described, *Free Enterprise Fund*'s analysis on that score relied on the separation between the Board and the SEC. See *supra*, at 10. The accounting firm, recall, was enmeshed in a Board investigation. But some Board actions never go to the SEC—and the statutory scheme, we explained, "provides only for judicial review of *Commission* action." 561 U. S., at 490 (emphasis in original). That meant the accounting firm, absent district court jurisdiction, might never have had judicial recourse. But no such worry exists here. Cochran and Axon are parties in ongoing SEC and FTC proceedings, and the statutes at issue provide for judicial review of SEC and FTC action. See 15 U. S. C. §§45(c), 78y(a). Under those statutes, Axon and Cochran can (eventually) obtain review of their constitutional claims through an appeal from an adverse agency

---

[2] That is so, as both decisions held, even if the agency itself could not have considered or remedied the party's claim—for example, when the agency lacks the power to "declare a statute unconstitutional." *Elgin,* 567 U. S., at 17; see *Thunder Basin*, 510 U. S., at 215. It is also so, as *Thunder Basin* illustrates, regardless of whether the claim involves a matter of substance (*e.g.*, the coal company's alleged right to exclude union officials) or one of procedure (*e.g.*, the company's asserted entitlement to an earlier hearing). See *id.*, at 214–215; *supra*, at 8–9.

action to a court of appeals. So *Free Enterprise Fund*'s analysis of the judicial review factor does not control.

Yet a problem remains, stemming from the interaction between the alleged injury and the timing of review. To see the difficulty, think first about *Thunder Basin* and *Elgin*. If an appellate court had ruled in favor of the coal company or the federal employee on review of an agency decision, the court could have remedied the party's injury. It could have revoked the fine assessed on the company or reinstated the employee with backpay. But not so here. The harm Axon and Cochran allege is "being subjected" to "unconstitutional agency authority"—a "proceeding by an unaccountable ALJ." Brief for Axon 36; see Brief for Cochran 37 (contending she suffers harm from "having to appear in proceedings" before an unconstitutionally insulated ALJ). That harm may sound a bit abstract; but this Court has made clear that it is "a here-and-now injury." *Seila Law LLC* v. *Consumer Financial Protection Bureau*, 591 U. S. \_\_\_, \_\_\_ (2020) (slip op., at 10) (internal quotation marks omitted). And—here is the rub—it is impossible to remedy once the proceeding is over, which is when appellate review kicks in. Suppose a court of appeals agrees with Axon, on review of an adverse FTC decision, that ALJ-led proceedings violate the separation of powers. The court could of course vacate the FTC's order. But Axon's separation-of-powers claim is not about that order; indeed, Axon would have the same claim had it *won* before the agency. The claim, again, is about subjection to an illegitimate proceeding, led by an illegitimate decisionmaker. And as to that grievance, the court of appeals can do nothing: A proceeding that has already happened cannot be undone. Judicial review of Axon's (and Cochran's) structural constitutional claims would come too late to be meaningful.

The limits of that conclusion are important to emphasize. The Government, in disputing our position, notes that many review schemes—involving not only agency action

but also civil and criminal litigation—require parties to wait before appealing, even when doing so subjects them to "significant burdens." Brief for Federal Parties 47–49. That is true, and will remain so: Nothing we say today portends newfound enthusiasm for interlocutory review. Return, for example, to *Thunder Basin* and *Elgin*. There, the coal company and federal employee could both have argued that the statutory review process would subject them to greater litigation costs than their preferred suit in district court. But that would not have mattered. We have made clear, just as the Government says, that "the expense and disruption" of "protracted adjudicatory proceedings" on a claim do not justify immediate review. *FTC* v. *Standard Oil Co. of Cal.*, 449 U. S. 232, 244 (1980); see, *e.g.*, *Myers* v. *Bethlehem Shipbuilding Corp.*, 303 U. S. 41, 51 (1938). What makes the difference here is the nature of the claims and accompanying harms that the parties are asserting. Again, Axon and Cochran protest the "here-and-now" injury of subjection to an unconstitutionally structured decisionmaking process. See *supra*, at 13. And more, subjection to that process irrespective of its outcome, or of other decisions made within it. A nearer analogy than any the Government offers is to our established immunity doctrines. There, we have identified certain rights "not to stand trial" or face other legal processes. *Mitchell* v. *Forsyth*, 472 U. S. 511, 526 (1985). And we have recognized that those rights are "effectively lost" if review is deferred until after trial. *Ibid.* So too here, Axon and Cochran will lose their rights not to undergo the complained-of agency proceedings if they cannot assert those rights until the proceedings are over.

The collateralism factor favors Axon and Cochran for much the same reason—because they are challenging the Commissions' power to proceed at all, rather than actions taken in the agency proceedings. That distinction, as noted

earlier, guided *Free Enterprise Fund*'s view that the accounting firm's challenge qualified as "collateral." See 561 U. S., at 490; *supra*, at 10. The firm, the court reasoned, "object[ed] to the Board's existence, not to any of [the] auditing standards" it might apply in regulating accountants. 561 U. S., at 490. Likewise here, both parties object to the Commissions' power generally, not to anything particular about how that power was wielded. The parties' separation-of-powers claims do not relate to the subject of the enforcement actions—in the one case auditing practices, in the other a business merger. Cf. *Mohawk Industries, Inc.* v. *Carpenter*, 558 U. S. 100, 106 (2009) (considering as part of the "collateral order doctrine," which governs appeals in non-agency litigation, whether a question is "separate from the merits"). Nor do the parties' claims address the sorts of procedural or evidentiary matters an agency often resolves on its way to a merits decision. Cf. *Florida Power & Light Co.* v. *Lorion*, 470 U. S. 729, 743 (1985) (favoring review of such preliminary matters along with the agency's final order). The claims, in sum, have nothing to do with the enforcement-related matters the Commissions "regularly adjudicate[]"—and nothing to do with those they would adjudicate in assessing the charges against Axon and Cochran. *Elgin*, 567 U. S., at 22. Because that is so, the parties' claims are "'collateral' to any Commission orders or rules from which review might be sought." *Free Enterprise Fund*, 561 U. S., at 490.

The Government's contrary argument would strip the collateralism factor of its appropriate function. In the Government's view, no claim "directed at" a pending Commission proceeding can qualify as collateral to it, even if wholly disconnected in subject. Tr. of Oral Arg. in No. 21–86, p. 75; see Brief for Federal Parties 39, 52–53. The Government thinks that position consistent with *Free Enterprise Fund* because there an SEC proceeding had not yet begun. See Brief for Federal Parties 38–39 (noting that the accounting

firm remained enmeshed in a Board investigation).  But the Government's argument still conflicts with *Free Enterprise Fund*'s reasoning.  In addressing why the firm's claim was collateral, the Court focused solely on what it was about—again, that the firm challenged "the Board's existence," not "its auditing standards."  561 U. S., at 490.  And anyway, the Government's theory ill fits the point of the *Thunder Basin* inquiry—to decide when a particular claim is "of the type" to fall outside a statutory review scheme.  510 U. S., at 212.  That inquiry, just as *Free Enterprise Fund* recognized, requires considering the nature of the claim, not the status (pending or not) of an agency proceeding.  Or said another way, the inquiry contemplates (as our collateral-order doctrine also does) that even when a proceeding is pending, an occasional claim may get immediate review—in part because it involves something discrete.  Cf. *Cohen* v. *Beneficial Industrial Loan Corp.*, 337 U. S. 541, 546 (1949) (allowing an interlocutory appeal from a district court's "collateral" ruling, "independent of the cause itself").  The Government's redefinition of what counts as collateral would effectively foreclose that possibility.

Third and finally, Cochran's and Axon's claims are "outside the [Commissions'] expertise."  *Thunder Basin*, 510 U. S., at 212.  On that issue, *Free Enterprise Fund* could hardly be clearer.  Claims that tenure protections violate Article II, the Court there determined, raise "standard questions of administrative" and constitutional law, detached from "considerations of agency policy."  561 U. S., at 491 (internal quotation marks and alterations omitted); see *supra*, at 10.  That statement covers Axon's and Cochran's claims that ALJs are too far insulated from the President's supervision.  And Axon's constitutional challenge to the combination of prosecutorial and adjudicative functions is of a piece—similarly distant from the FTC's "competence and expertise."  561 U. S., at 491.  The Commission knows a good deal about competition policy, but nothing special

about the separation of powers. For that reason, we observed two Terms ago, "agency adjudications are generally ill suited to address structural constitutional challenges"—like those maintained here. *Carr* v. *Saul*, 593 U. S. \_\_\_, \_\_\_ (2021) (slip op., at 9).

On this last factor, even the Government mostly gives up the ghost. Its argument goes: "Even when an agency lacks expertise in interpreting the Constitution, it can still 'apply its expertise' by deciding other issues"—whether "statutory, regulatory, or factual"—"that 'may obviate the need to address the constitutional challenge.'" Brief for Federal Parties 54 (quoting *Elgin*, 567 U. S., at 22–23). The first clause of that sentence concedes the expertise point—and the rest cannot reclaim it. True enough, we partly relied in *Elgin* on the MSPB's expertise on a raft of ordinary employment issues surrounding the employee's contention that the Equal Protection Clause barred his discharge. See 567 U. S., at 22–23; *supra*, at 9. But the Government here does not pretend that Axon's and Cochran's constitutional claims are similarly intertwined with or embedded in matters on which the Commissions are expert. (It is precisely because those claims are not so entangled that the Government must try to redefine what it means for claims to be "collateral" to an agency action. See *supra*, at 15–16.) And unlike in *Elgin*, ruling for Axon and Cochran on expertise-laden grounds would not "obviate the need" to address their constitutional claims—which, again, allege injury not from this or that ruling but from subjection to all agency authority. Those claims of here-and-now harm would remain no matter how much expertise could be "brought to bear" on the other issues these cases involve. *Thunder Basin*, 510 U. S., at 215.

All three *Thunder Basin* factors thus point in the same direction—toward allowing district court review of Axon's and Cochran's claims that the structure, or even existence, of an agency violates the Constitution. For the reasons

given above, those claims cannot receive meaningful judicial review through the FTC Act or Exchange Act. They are collateral to any decisions the Commissions could make in individual enforcement proceedings. And they fall outside the Commissions' sphere of expertise. Our conclusion follows: The claims are not "of the type" the statutory review schemes reach. *Id.*, at 212. A district court can therefore review them.

*        *        *

We accordingly reverse the judgment of the Court of Appeals for the Ninth Circuit, affirm the judgment of the Court of Appeals for the Fifth Circuit, and remand the two cases for further proceedings consistent with this opinion.

*It is so ordered.*

# SUPREME COURT OF THE UNITED STATES

---

Nos. 21–86 and 21–1239

---

AXON ENTERPRISE, INC., PETITIONER
21–86          *v.*
FEDERAL TRADE COMMISSION, ET AL.

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF
APPEALS FOR THE NINTH CIRCUIT

SECURITIES AND EXCHANGE COMMISSION, ET AL.,
PETITIONERS
21–1239          *v.*
MICHELLE COCHRAN

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF
APPEALS FOR THE FIFTH CIRCUIT

[April 14, 2023]

JUSTICE THOMAS, concurring.

I join the Court's opinion in full because it correctly applies precedent to determine that Axon Enterprise's and Michelle Cochran's structural constitutional claims need not be channeled through the administrative review schemes at issue. I write separately, however, because I have grave doubts about the constitutional propriety of Congress vesting administrative agencies with primary authority to adjudicate core private rights with only deferential judicial review on the back end.

## I
### A

The Court correctly notes that precedent allows Congress to replace Article III district courts with "an alternative

scheme of review," as it did in the provisions of the Securities Exchange Act and the Federal Trade Commission Act at issue here. *Ante*, at 7; see 15 U. S. C. §§45(c) and 78y(a). Under such schemes, administrative agencies may impose orders and penalties on private parties; adjudicate them before agency administrative law judges (ALJs); and only then be subjected to deferential review by an Article III court. As the Court puts it, "[t]he agency effectively fills in for the district court, with the court of appeals providing judicial review." *Ante*, at 7. That Article III review is sharply limited. For example, under the administrative review schemes at issue here, the reviewing court must treat agency findings of fact as "conclusive" so long as they are "supported by substantial evidence," §78y(a)(4); see §45(c) ("if supported by evidence"), a highly deferential standard of review.[1] The reviewing court also cannot take its own evidence—it can only remand the case to the agency for further proceedings. See §§45(c) and 78y(a)(5).

This mixed system—primary adjudication by an executive agency subject to only limited Article III review—is unlike the system that prevailed for the first century of our Nation's existence. During that period, judicial review was "all-or-nothing"; "either a court had authority to review administrative action or not, and if it did, it decided the whole case." T. Merrill, Article III, Agency Adjudication, and the Origins of the Appellate Review Model of Administrative Law, 111 Colum. L. Rev. 939, 944, 952 (2011) (Merrill). This all-or-nothing model rested on a conceptual distinction

—————

[1] Deferential review of the SEC's and FTC's decisions is particularly concerning given their tendency to overwhelmingly agree with their respective agency's decisions. See 986 F. 3d 1173, 1187 (CA9 2021) ("FTC has not lost a single case [in administrative proceedings] in the past quarter-century. Even the 1972 Miami Dolphins would envy that type of record"); Brief for Respondent in No. 21–1239, p. 9 (noting that, between October 2010 and March 2015, SEC won more than 90% of cases brought before its ALJs as compared to 69% of cases brought before federal courts).

between core private rights, on the one hand, and mere public rights and governmental privileges, on the other. "Disposition of private rights to life, liberty, and property" was understood to "fal[l] within the core of the judicial power, whereas disposition of public rights [was] not." *Wellness Int'l Network, Ltd.* v. *Sharif*, 575 U. S. 665, 711 (2015) (THOMAS, J., dissenting). Thus, "[t]he measure of judicial involvement was private right. In particular, the extent to which the judiciary reviewed actions and legal determinations of the executive depended on private right." J. Harrison, Jurisdiction, Congressional Power, and Constitutional Remedies, 86 Geo. L. J. 2513, 2516 (1998) (footnote omitted).[2] Even today, the distinction "between 'public rights' and 'private rights'" continues to inform this Court's understanding of "Article III judicial power." *Oil States Energy Services, LLC* v. *Greene's Energy Group, LLC*, 584 U. S. ___, ___ (2018) (slip op., at 6).

As I have explained, when private rights are at stake, full Article III adjudication is likely required. Private rights encompass "the three 'absolute' rights," life, liberty, and property, "so called because they 'appertain and belong to particular men merely as individuals,' not 'to them as members of society or standing in various relations to each other'—that is, not dependent upon the will of the government." *Wellness Int'l Network*, 575 U. S., at 713–714 (dissenting opinion) (quoting 1 W. Blackstone, Commentaries on the Laws of England 119 (1765); alterations omitted).

_____

[2] This also helps to explain why, in *Marbury* v. *Madison*, 1 Cranch 137 (1803), Chief Justice Marshall found it necessary to first determine whether Marbury was "entitled to the possession of those evidences of office, which, being completed, *became his property*." *Id.*, at 155 (emphasis added). Only once it was established that a vested property right was at stake did the Court determine the remaining issues. *Marbury* thus "stand[s] for the importance of private right." Harrison, 86 Geo. L. J., at 2516, n. 10.

Such rights could be adjudicated and divested only by Article III courts. See 575 U. S., at 713 ("[A]n exercise of the judicial power is required 'when the government wants to act authoritatively upon core private rights that had vested in a particular individual'" (quoting C. Nelson, Adjudication in the Political Branches, 107 Colum. L. Rev. 559, 569 (2007) (Nelson); alteration omitted)); see also J. Mascott, Constitutionally Conforming Agency Adjudication, 2 Loyola U. Chi. J. Reg. Compliance 22, 45 (2017) (Mascott) ("Cases involving . . . deprivations or transfers of life, liberty, or property constitute a 'core' of cases that . . . must be resolved by Article III courts—not executive adjudicators 'dressed up as courts'").

A different regime prevailed for public rights and privileges. Unlike "the *private* unalienable rights of each individual," *Lansing* v. *Smith*, 4 Wend. 9, 21 (N. Y. 1829), public rights "belon[g] to the people at large," and governmental privileges are "created purely for reasons of public policy and ha[ve] no counterpart in the Lockean state of nature." *Teva Pharmaceuticals USA, Inc.* v. *Sandoz, Inc.*, 574 U. S. 318, 344, n. 2 (2015) (THOMAS, J., dissenting) (internal quotation marks omitted). It was understood at the founding that such governmental privileges (some of which we today call Government benefits and entitlements) "could be taken away without judicial process." *Sessions* v. *Dimaya*, 584 U. S. ___, ___ (2018) (THOMAS, J., dissenting) (slip op., at 9); see also Mascott 25. Thus, "the legislative and executive branches may dispose of public rights [and privileges] at will—including through non-Article III adjudications." *Wellness Int'l Network*, 575 U. S., at 713 (THOMAS, J., dissenting).

## B

The requirement of plenary Article III adjudication of private rights began to change in the early 20th century. As notions of administrative efficiency came into vogue, courts

were viewed less as guardians of core private rights and more as impediments to expert administrative adjudication. See 20 F. 4th 194, 219 (CA5 2021) (Oldham, J., concurring). After his election in 1904, President Theodore Roosevelt, who "shared the progressive faith in administrative expertise," sought to "rei[n] in judicial review" of administrative action. Merrill 955. This progressive sentiment led to the Hepburn Act, 34 Stat. 584, which was designed to curb judicial review of Interstate Commerce Commission (ICC) rate orders. Prior to the Hepburn Act, the ICC was required to file a bill of equity in court to obtain judicial enforcement of its rate orders. Merrill 955. But, the Hepburn Act provided that the ICC's "orders were to be self-executing thirty days after they became final, unless 'suspended or set aside by a court of competent jurisdiction'"—almost inverting the traditional system. *Ibid.* (quoting 34 Stat. 589). While the Act was silent on the standard of review, this Court understood "the implied threat that if [it] did not back off from its aggressive review practices, more drastic action would be in the offing." Merrill 959.

Accordingly, the Court began to develop what is now known as the "appellate review model." See *id.*, at 963–965. While maintaining that the courts must decide "all relevant questions of constitutional power or right" and other questions of law, *ICC* v. *Illinois Central R. Co.*, 215 U. S. 452, 470 (1910), the Court held that an ICC order "supported by evidence" must be "accepted as final," *ICC* v. *Union Pacific R. Co.*, 222 U. S. 541, 547 (1912). Following the Court's lead, Congress codified the appellate review model in the two statutes at issue here. The Federal Trade Commission Act provided that "the findings of the commission as to the facts, if supported by testimony, shall in like manner be conclusive" in federal court. 38 Stat. 720 (codified, as amended, at 15 U. S. C. §45(c)). The Securities Exchange Act of 1934 likewise provided that the SEC's findings "shall

be conclusive" "if supported by substantial evidence." 48 Stat. 902 (codified, as amended, at 15 U. S. C. §78y).

In the 1930s, this Court upheld the constitutionality of the appellate review model against arguments that it violated the separation of powers and Seventh Amendment. First, in *Crowell* v. *Benson*, 285 U. S. 22 (1932), the Court examined the Longshoremen's and Harbor Workers' Compensation Act, which authorized administrative agencies to adjudicate workers' compensation claims against private parties. The Court acknowledged that the case was "one of private right," *id.*, at 51, but held that Congress had the authority to place primary factfinding authority in an administrative agency, *id.*, at 54. It reasoned that such a scheme did not violate Article III because "Congress has considerable power to structure [judicial] proceedings and to regulate the mechanisms that courts use to ascertain facts." Nelson 600.

Next, in *NLRB* v. *Jones & Laughlin Steel Corp.*, 301 U. S. 1 (1937), the Court examined the National Labor Relations Act's judicial review provisions, which required an Article III court to accept the National Labor Relations Board's factual findings so long as they were "supported by evidence" in the administrative record. 49 Stat. 454. The Court held that this arrangement did not violate the Seventh Amendment, which provides that "[i]n Suits at common law, where the value in controversy shall exceed twenty dollars, the right of trial by jury shall be preserved." The Court reasoned that, "because claims seeking statutory remedies for violations of the Act were 'statutory proceedings' that were 'unknown to the common law,' they were not 'suits at common law' within the meaning of the Seventh Amendment." Nelson 602 (quoting *Jones & Laughlin*, 301 U. S., at 48; alterations omitted). These cases solidified administrative agencies' authority "to act as factfinding adjuncts to the fed-

eral judiciary on a broad array of statutory claims, including claims for monetary relief." Nelson 602.[3]

## II

As I have previously explained, "[b]ecause federal administrative agencies are part of the Executive Branch, it is not clear that they have power to adjudicate claims involving core private rights." *B&B Hardware, Inc.* v. *Hargis Industries, Inc.*, 575 U. S. 138, 171 (2015) (dissenting opinion). The "appellate review model" of agency adjudication thus raises serious constitutional concerns. It may violate the separation of powers by placing adjudicatory authority over core private rights—a judicial rather than executive power—within the authority of Article II agencies. See *ibid.* ("To the extent that administrative agencies could, consistent with the Constitution, function as courts, they might only be able to do so with respect to claims involving public or quasi-private rights"). It may violate Article III by compelling the Judiciary to defer to administrative agencies regarding matters within the core of the Judicial Vesting Clause. See P. Hamburger, Is Administrative Law Unlawful? 297 (2014) (Hamburger) (explaining that, traditionally, "even at the behest of Congress, the judges could not defer to the executive record or the facts supposedly established by it, lest they abandon their office of independent judgment and the office of juries to decide the

―――――――

[3] The Court has further blurred the line between adjudications that require Article III courts and those that do not by equating mere Government benefits and entitlements with core private rights. See, *e.g.*, *Goldberg* v. *Kelly*, 397 U. S. 254, 261–263 (1970) (holding that due process rights attach to the deprivation of Government benefits); see also *id.*, at 262, n. 8 ("It may be realistic today to regard welfare entitlements as more like 'property' than a 'gratuity.' . . . It has been aptly noted that 'society today is built around entitlement'" (quoting C. Reich, Individual Rights and Social Welfare: The Emerging Legal Issues, 74 Yale L. J. 1245, 1255 (1965); alteration omitted)).

facts"). And, it may violate due process by empowering entities that are not courts of competent jurisdiction to deprive citizens of core private rights. See *B&B Hardware*, 575 U. S., at 164 (THOMAS, J., dissenting) ("[H]owever broadly 'court of competent jurisdiction' was defined, it would require quite a leap to say that the concept encompasses administrative agencies, which were recognized as categorically different from courts" (alteration omitted)); see also Hamburger 256 ("The guarantee of due process . . . . bars the government from holding subjects to account outside courts and their processes"). Finally, the appellate review model may run afoul of the Seventh Amendment by allowing an administrative agency to adjudicate what may be core private rights without a jury. See *Tull* v. *United States*, 481 U. S. 412, 417 (1987) (explaining that the Seventh Amendment ensures the right to a jury trial for all adjudications "analogous to 'Suits at common law'").

It is no answer that an Article III court may eventually review the agency order and its factual findings under a deferential standard of review. In fact, there seems to be no basis for treating factfinding differently from deciding questions of law. Both are at the core of judicial power, as Article III itself acknowledges. See §2, cl. 2 (providing that this Court's appellate jurisdiction is "both as to Law and Fact"); see also *Stern* v. *Marshall*, 564 U. S. 462, 484 (2011). For much of the Nation's history, it was understood that Article III precluded "the political branches" from exercising "power over the determination of individualized adjudicative facts when core private rights were at stake." Nelson 593 (emphasis deleted); see also Hamburger 297. It is obvious that Article III "would not be satisfied if Congress provided for judicial review but ordered the courts to affirm the agency no matter what." G. Lawson, The Rise and Rise of the Administrative State, 107 Harv. L. Rev. 1231, 1247 (1994) (Lawson). And, "[t]here is no reason to think that it is any different if Congress instead simply orders courts to

put a thumb (or perhaps two forearms) on the agency's side of the scale." *Id.*, at 1247–1248. Such a regime "allows a mere party to supplant a jury as the court's fact finder," Hamburger 319, and it "effectively vest[s] the judicial power either in the agency or in Congress," Lawson 1247. It thus appears likely that, "when agency adjudicators stray outside the proper limits of executive adjudication such as by depriving individuals of vested property rights, they must not serve even as fact-finders subject to judicial deference." Mascott 25 (footnote omitted).

In sum, whether any form of administrative adjudication is constitutionally permissible likely turns on the nature of the right in question. If private rights are at stake, the Constitution likely requires plenary Article III adjudication. Conversely, if privileges or public rights are at stake, Congress likely can foreclose judicial review at will.

## III

The rights at issue in these cases appear to be core private rights that must be adjudicated by Article III courts. For one, Axon and Cochran face the threat of significant monetary fines. Indeed, in the first round of proceedings, the SEC imposed a $22,500 civil penalty on Cochran. And, the FTC seeks to require Axon to transfer intellectual property to another entity. These types of penalties and orders implicate the core private right to property. See Lawson 1247 ("imposition of a civil penalty or fine" implicates core Article III power); see also Nelson 626–627. Accordingly, they likely must be adjudicated by Article III courts and juries. See *Tull*, 481 U. S., at 422 ("A civil penalty was a type of remedy at common law that could only be enforced in courts of law"); accord, *id.*, at 427–428 (Scalia, J., concurring in part and dissenting in part). Naturally, merely labeling the deprivation of a core private right a "civil penalty" cannot allow Congress and agencies to circumvent constitutional requirements. Cf. *Granfinanciera, S. A.* v.

*Nordberg*, 492 U. S. 33, 61 (1989) ("Congress cannot elimi-
nate a party's Seventh Amendment right to a jury trial
merely by relabeling the cause of action to which it attaches
and placing exclusive jurisdiction in an administrative
agency or a specialized court of equity").  By permitting ad-
ministrative agencies to adjudicate what may be core pri-
vate rights, the administrative review schemes here raise
serious constitutional issues.

*         *         *

Because the Court today correctly holds that Axon's and
Cochran's claims are not precluded by the review-channeling
provisions at issue here, I join its opinion in full.  In an ap-
propriate case, we should consider whether such schemes
and the appellate review model they embody are constitu-
tional methods for the adjudication of private rights.

# SUPREME COURT OF THE UNITED STATES

---

Nos. 21–86 and 21–1239

---

AXON ENTERPRISE, INC., PETITIONER
21–86　　　　　　　　*v.*
FEDERAL TRADE COMMISSION, ET AL.

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF
APPEALS FOR THE NINTH CIRCUIT

SECURITIES AND EXCHANGE COMMISSION, ET AL.,
PETITIONERS
21–1239　　　　　　　　*v.*
MICHELLE COCHRAN

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF
APPEALS FOR THE FIFTH CIRCUIT

[April 14, 2023]

JUSTICE GORSUCH, concurring in judgment.

I agree with the Court that Michelle Cochran and Axon Enterprise are entitled to their day in court. But to my mind the reason why has nothing to do with the "*Thunder Basin* factors." *Ante*, at 8. Instead, it follows directly from 28 U. S. C. §1331.

## I

The Constitution vests in Congress the power to create and organize lower federal courts. See Art. I, §8, cl. 9; Art. III, §1; *Sheldon* v. *Sill*, 49 U. S. 441, 449 (1850). Exercising that power, for the last 150 years Congress has afforded lower federal courts jurisdiction to hear civil disputes arising under the Constitution or laws of the United States. Act of Mar. 3, 1875, ch. 137, §1, 18 Stat. 470; see also Act of Dec. 1, 1980, 94 Stat. 2369 (eliminating amount-

in-controversy requirement). Today, §1331 provides that "district courts shall have original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States." Not *may* have jurisdiction, but *shall*. Not *some* civil actions arising under federal law, but *all*. The statute is as clear as statutes get, and everyone agrees it encompasses the claims Ms. Cochran and Axon seek to pursue. See *ante*, at 7. End of case, right?

Not so fast. As the Court sees it, Ms. Cochran, Axon, and others like them must satisfy not only §1331. They must also satisfy a judge-made, multi-factor balancing test. One assembled from remarks scattered here and there across the pages of *Thunder Basin Coal Co.* v. *Reich*, 510 U. S. 200 (1994). And one, we are told, designed to ferret out whether the legislators who adopted the Federal Trade Commission Act in 1914 and the Securities Exchange Act in 1934 harbored an "implici[t]" wish to "ous[t]" district courts of jurisdiction in favor of agency proceedings. *Ante*, at 7. So, yes, the law on the books may promise you the right to be heard in a court of law. But sometimes that doesn't count for much. Sometimes judges can shunt you to an agency instead—so long as a test we have fabricated suggests to us that is what Congress *really* wanted.

There are many problems with the *Thunder Basin* project, but start with its sheer incoherence. At the outset, *Thunder Basin* requires litigants and courts to ask whether a "'comprehensive review process'" exists. *Ante*, at 7. What does that mean? It seems a review process will "typically" qualify as "comprehensive" when "review in a court of appeals follow[s] the agency's own review." *Ibid.* But "typically" does not mean "necessarily." *Ibid.* Just because an agency can hear a case does not mean a district court cannot. To decide whether a particular case belongs in an agency rather than a court, you must consult three further "considerations . . . commonly known now as the *Thunder Basin* factors." *Ante,* at 7–8.

That's where the magic happens. The *Thunder Basin* factors require assessing whether: (1) "precluding district court jurisdiction" would "foreclose all meaningful judicial review"; (2) the plaintiff's claims are "wholly collateral" to the statutory review scheme; and (3) the claims are "outside the agency's expertise." *Ante*, at 8 (internal quotation marks omitted); see generally 510 U. S., at 207–215. Harnessing the energy of these various factors, we are assured, will allow anyone to detect a latent congressional intent to oust district courts of their jurisdiction in any given case. See *ante*, at 8–10.

Just see how easy it is. To apply the first factor, all you have to do is ask a few more questions. They include whether the plaintiff could "eventually" obtain review in some federal court; whether that court's review "would come too late to be meaningful"; and (maybe) how analogous the plaintiff's plea for immediate review is to a governmental official's plea for qualified immunity. *Ante*, at 12–14. If this is starting to seem more confounding than clarifying, do not worry. The first factor is the "least straightforward" anyway. *Ante*, at 11. When it comes to the second factor, you only need to evaluate the "collateralism" of the plaintiff's claim. *Ante*, at 14. Apparently, that "requires considering the nature of the claim, not the status (pending or not) of an agency proceeding." *Ante*, at 16. The third factor is just one easy question too, focused on whether the plaintiff's claim is "intertwined with or embedded in matters on which the [agency is] expert." *Ante*, at 17. If that does not help, try asking if the claim is "entangled" with the agency's expertise, *ibid.*, or if the agency can bring to bear "distinctive knowledge," *ante*, at 8.

Even after you make it through these twists and turns, a final surprise sometimes awaits. The Court holds that all three *Thunder Basin* factors favor Ms. Cochran and Axon, so their cases may proceed in district court. *Ante*, at 17–18.

But what happens when the factors point in different directions, some in favor and others against immediate judicial review? No one knows. You get to *guess*.[1]

## II

Putting aside these problems with the *Thunder Basin* project serves only to expose others. We are told that consulting so many disparate factors is essential if we are to divine and give effect to "implici[t]" congressional "inten[tions]" to divest district courts of jurisdiction in favor of certain agency proceedings. *Ante*, at 7 (internal quotation marks omitted). But what gives courts authority to engage in this business of jurisdiction-stripping-by-implication?

The answer, of course, is nothing. Under our Constitution, "Congress, and not the Judiciary, defines the scope of federal jurisdiction." *New Orleans Public Service, Inc.* v. *Council of City of New Orleans*, 491 U. S. 350, 359 (1989). Federal courts "have no more right to decline the exercise of jurisdiction which is given, than to usurp that which is not given." *Cohens* v. *Virginia*, 6 Wheat. 264, 404 (1821) (Marshall, C. J., for the Court). That is why we have called it the "true rule" that "statutes clearly defining the jurisdiction of the courts . . . must control . . . in the absence of subsequent legislation equally express." *Rosencrans* v. *United States*, 165 U. S. 257, 262 (1897). And why we have said that "jurisdiction conferred by 28 U. S. C. §1331," in particular, "should hold firm against mere implication[s]" from other laws. *Mims* v. *Arrow Financial Services, LLC*, 565 U. S. 368, 383 (2012) (internal quotation marks omitted).

*Thunder Basin* defies these foundational rules. Maybe

---

[1] See Tr. of Oral Arg. in No. 21–86, p. 81 ("JUSTICE ALITO: . . . Does Axon have to win on all three? Do you have to win on all three? Or can either of you win if one or more factors go in one direction and the other factor or factors go in the other direction? [Deputy Solicitor General]: . . . I'm not trying to be obstreperous, but I think it would depend . . .").

worse, it exhibits familiarity with none of them. No one disputes that §1331 represents a valid exercise of Congress's authority to regulate the jurisdiction of the district courts. No one questions that §1331 permits cases like those before us to proceed. No Member of the Court points to any statute Congress has adopted that speaks otherwise. Under the law, that should be the end of the matter. But under *Thunder Basin*, courts may refuse individuals their right to a judicial forum based on nothing more than suppositions about "implici[t]" congressional "inten[tions]." *Ante*, at 7. Divesting jurisdiction by mere implication goes from out-of-bounds to the name of the game. Along the way, this Court arrogates to itself a power to control the jurisdiction of lower federal courts that the Constitution reserves to Congress.

All to what end? At bottom, *Thunder Basin* rests on a view that it is sometimes more important to allow agencies to work without the bother of having to answer suits against them than it is to allow individuals their day in court. But when Congress holds that view, it does not ask us to juggle a variety of factors and then guess at the implicit intentions of legislators past. It simply tells us. See, *e.g.,* 12 U. S. C. §1818(i)(1) ("[E]xcept as otherwise provided in this section or under section 1831*o* or 1831p–1 of this title no court shall have jurisdiction to affect by injunction or otherwise the issuance or enforcement of any notice or order under any such section"); 42 U. S. C. §405(h) ("No action against the United States, the Commissioner of Social Security, or any officer or employee thereof shall be brought under section 1331 or 1346 of title 28 to recover on any claim arising under this subchapter").[2]

_____

[2] These are only a few of the conceptual problems with the *Thunder Basin* project. Here's another: If the *Thunder Basin* factors really did delineate the bounds of §1331 jurisdiction, a district court would have to balance them in every case where there is even the possibility of parallel agency proceedings. That would hold true regardless of whether the

### III

There is a better way. Our job is to interpret the laws Congress has adopted. It is a task that "begins with the language of the [relevant] statute[s]" and, when "the statutory language provides a clear answer, it ends there as well." *Hughes Aircraft Co.* v. *Jacobson*, 525 U. S. 432, 438 (1999) (internal quotation marks omitted). Because no one doubts that §1331 vests district courts with jurisdiction to hear these cases, the only question properly before us is whether Congress has *actually* carved out some exception in some other statute. The government points to two candidates. But the government's arguments from those laws are so improbable that the Court barely mentions them. I pause to walk through each only to illustrate how these cases should have been resolved.

In Ms. Cochran's case, the government directs our attention to §78y(a)(1) of the Exchange Act. That provision says that "[a] person aggrieved by a final order of the Commission . . . may obtain review of the order in the United States Court of Appeals . . . by filing in such court . . . a written petition requesting that the order be modified or set aside in whole or in part." 15 U. S. C. §78y(a)(1). Plainly, the statute promises jurisdiction in a court of appeals for those

---

agency invokes *Thunder Basin* and regardless of whether the agency itself may prefer to proceed in court. See *Wilkins* v. *United States*, 598 U. S. ___, ___ (2023) (slip op., at 4) ("courts have a duty to consider [jurisdictional bars] *sua sponte*"). But this Court has never said *Thunder Basin* commands anything like *that*. At the very least, then, the Court should acknowledge *Thunder Basin* for what it truly is: a judge-made exhaustion requirement, not a jurisdictional rule. Even that much candor, however, would not rescue the contrivance. As this Court has recognized, we possess no more authority to "impos[e] extra-statutory limitations" on the "capacity to sue" than we do to impose extra-statutory limitations on the jurisdiction of the lower federal courts. *Ross* v. *Blake*, 578 U. S. 632, 640, n. 1 (2016); see *Jones* v. *Bock*, 549 U. S. 199, 203 (2007) ("crafting and imposing" exhaustion rules "not required by" statute "exceeds the proper limits on the judicial role").

hoping to contest "a final order of the Commission." But just as plainly, Ms. Cochran does not seek to challenge an SEC final order. Nor could she, because the agency has not entered one in her case. Ms. Cochran does not even seek relief in anticipation of a final agency order. Instead, she seeks to avoid being hauled before an agency that she alleges is unconstitutionally structured. See *ante*, at 4. That is exactly the kind of "here-and-now injury" this Court has held "can be remedied by a court" without regard to the eventual outcome of agency proceedings. *Seila Law LLC* v. *Consumer Financial Protection Bureau*, 591 U. S. ___, ___ (2020) (internal quotation marks omitted) (slip op., at 10).

If all that were not enough, there is more. A neighboring statutory provision says that "the rights and remedies" the Exchange Act authorizes "shall be in addition to any and all other rights and remedies that may exist at law or in equity." §78bb(a)(2). This Court has explained that a "saving clause" of this sort "strongly buttresse[s]" the conclusion that a review provision such as §78y(a)(1) does not preclude "traditional avenues of judicial relief." *Abbott Laboratories* v. *Gardner*, 387 U. S. 136, 142, 144 (1967). And, of course, one traditional avenue of relief is a suit in district court under §1331 seeking to enjoin unconstitutional conduct. See *Free Enterprise Fund* v. *Public Company Accounting Oversight Bd.*, 561 U. S. 477, 491, n. 2 (2010). Far from barring Ms. Cochran's path to court, then, the Exchange Act expressly preserves it.

The story repeats itself when it comes to Axon. The government insists that §5(c) of the FTC Act precludes district courts from entertaining constitutional challenges to the agency's structure. But §5(c) provides only that parties subject to "an order of the Commission to cease and desist from using any method of competition or act or practice may obtain a review of such order in the court of appeals of the United States." 15 U. S. C. §45(c). And, here again, we have nothing like that. The FTC has not ordered Axon to

cease and desist from anything.  That §5(c) does not fore-
close Axon's case finds reinforcement next door too.  Section
5(d) holds that, "[u]pon the filing of the record . . . the juris-
diction of the court of appeals of the United States to affirm,
enforce, modify, or set aside orders of the Commission shall
be exclusive."  §45(d).  So until an administrative record is
lodged in the court of appeals—something that hasn't hap-
pened here either—the appellate court's jurisdiction is not
exclusive and a plaintiff like Axon remains free to proceed
in district court.

   In both cases, the relevant statutes guide the way.  Sec-
tion 1331 grants district courts the power to hear Ms.
Cochran's and Axon's claims and no other law takes that
power away.  Resolving jurisdictional disputes by looking to
the terms of the statutes Congress has adopted may hold
none of the suspense that comes with a ride on the *Thunder
Basin* roller coaster.  But that is as it should be.  "Where
the statutory language is clear, our sole function . . . is to
enforce it according to its terms."  *Rake* v. *Wade*, 508 U. S.
464, 471 (1993) (internal quotation marks omitted).[3]

——————

   [3] The parties spar over whether the government forfeited different ar-
guments against district court jurisdiction premised on two provisions of
the Administrative Procedure Act (APA).  *E.g.,* Reply Brief for Respond-
ent in No. 21–1239, p. 21.  Forfeited or not, these arguments hardly help
the government.  One of the APA provisions the government cites con-
cerns review of "preliminary, procedural, or intermediate agency action."
5 U. S. C. §704.  The government assumes we have "agency action" by
dint of the "initiation" or "commencement" of agency proceedings against
Ms. Cochran and Axon.  Tr. of Oral Arg. in No. 21–86, p. 51; Tr. of Oral
Arg. in No. 21–1239, p. 67.  But "agency action" is a defined term, one
that embraces "the whole or a part of an agency rule, order, license, sanc-
tion, relief, or the equivalent or denial thereof, or failure to act."
5 U. S. C. §551(13).  Ms. Cochran and Axon are not subject to, and do not
seek review of, any of those things.  The other APA provision says "[t]he
form of proceeding for judicial review is the special statutory review pro-
ceeding relevant to the subject matter in a court specified by statute."
§703.  But as we have seen, Ms. Cochran and Axon do not seek judicial
review of an SEC final order or an FTC cease-and-desist order—and both

IV

While the Court reaches the right result today, its choice of the wrong path matters. Not just because continuing to apply the *Thunder Basin* factors leaves the law badly distorted. It also matters because *Thunder Basin*'s throw-it-in-a-blender approach to jurisdiction imposes serious and needless costs on litigants and lower courts alike.

Jurisdictional rules, this Court has often said, should be "clear and easy to apply." *Hamer* v. *Neighborhood Housing Servs. of Chicago*, 583 U. S. 17, \_\_\_ (2017) (slip op., at 8); see also *Sisson* v. *Ruby*, 497 U. S. 358, 364, n. 2 (1990); *Foremost Ins. Co.* v. *Richardson*, 457 U. S. 668, 676–677 (1982). For parties, "[c]omplex jurisdictional tests complicate a case, eating up time and money as [they] litigate, not the merits of their claims, but which court is the right court to decide those claims." *Hertz Corp.* v. *Friend*, 559 U. S. 77, 94 (2010). For courts, jurisdictional rules "mark the bounds" of their "'adjudicatory authority.'" *Boechler* v. *Commissioner*, 596 U. S. \_\_\_, \_\_\_ (2022) (slip op., at 2). Judges therefore "benefit from straightforward rules under which they can readily assure themselves of their power to hear a case," *Hertz*, 559 U. S., at 94, while "adventitious" rules leave them with "almost impossible" tasks to perform that squander their limited resources, *Executive Jet Aviation, Inc.* v. *Cleveland*, 409 U. S. 249, 266 (1972).

There are many words to describe the *Thunder Basin* factors, but "clear and easy to apply" are not among them. To appreciate the trouble *Thunder Basin* can generate for litigants and lower courts alike, consider some of the facts of Ms. Cochran's case that do not find their way into the Court's opinion.

A single mother of two and a certified public accountant, Ms. Cochran began looking for part-time work in 2007.

---

the Exchange Act and the FTC Act preserve their right to proceed in district court to address the here-and-now injuries they assert.

Eventually, she found a position at a small company called The Hall Group. Soon, however, she discovered that the owner, David Hall, was not just abrasive but dishonest. At one point, he even added Ms. Cochran's name to the firm's business license without her permission, all to facilitate his idea of rebranding his company as "The Hall Group CPAs." When Ms. Cochran protested, Mr. Hall offered her a choice: become a nonequity partner with no increase in pay so that he could use the new name or leave the firm. Ms. Cochran chose to quit and put the whole ordeal behind her.

Or so she thought. Years later, in 2016, Ms. Cochran learned that the SEC had initiated an enforcement proceeding against Mr. Hall, another of his former employees, and herself. The SEC charged Ms. Cochran with violating "Rule 2–02(b)(1) of Regulation S-X and Section 13(a) of the Securities Exchange Act of 1934 and Rules 13a–1 and 13a–13 thereunder," as well as "aid[ing] and abett[ing] . . . Rule 2–02(b)(1) violations." *In re Hall*, SEC Release No. 3–17228, p. 1 (2017). In English, the SEC alleged that Ms. Cochran had failed to complete auditing checklists, leaving certain sections of certain forms "blank." *Id.*, at 12–13. The agency brought these charges even though there was "no evidence" that the incomplete paperwork had resulted in any "monetary harm to clients or investors." *Id.,* at 28.

The SEC elected to proceed against Ms. Cochran before its own internal tribunal rather than (as it could have) a court of law. The agency assigned the case to one of its hearing officers (an "administrative law judge" or "ALJ"). Reportedly, that ALJ made a practice of warning defendants during settlement discussions that he had "never ruled against the agency's enforcement division." J. Eaglesham, SEC Judges' Fairness Is in Spotlight, Wall St. J., Nov. 23, 2015, p. C6. It seems, though, Ms. Cochran didn't take the hint. She refused to settle and sought to represent herself in the hearing that followed. It did not go well. Just as her hearing was about to start, her former boss settled his own

case and then turned about to testify against Ms. Cochran. In the end, the ALJ fined Ms. Cochran $22,500 and banned her from practicing before the SEC as an accountant for at least five years.

Ms. Cochran responded by asking the full Commission to review the ALJ's decision. Around the same time, this Court held in an unrelated case that the ALJ who presided over Ms. Cochran's case had been unconstitutionally appointed. See *Lucia* v. *SEC*, 585 U. S. \_\_\_, \_\_\_ (2018) (slip. op., at 2). Ms. Cochran might have thought that would bring her own case to a close. But the SEC chose instead to take a mulligan. In 2018, the agency vacated the initial decision against Ms. Cochran and assigned a different, properly appointed ALJ to retry the case. So two years after her administrative proceedings began, they began again.

For Ms. Cochran, that was enough. She sued the SEC in federal district court. She sought to enjoin the agency's proceedings on the ground that all of its ALJs are unconstitutionally insulated from presidential supervision, pointing to this Court's decisions in *Lucia* and *Free Enterprise Fund*. *Lucia* held that SEC ALJs are inferior officers under the Constitution's Appointments Clause. 585 U. S., at \_\_\_ (slip op., at 8). And *Free Enterprise Fund* held that the President must retain adequate authority to supervise and even remove such officers. 561 U. S., at 492.

In 2019, the district court dismissed Ms. Cochran's suit without reaching its merits. 2019 WL 1359252 (ND Tex., Mar. 25, 2019). The court did so because it thought *Thunder Basin* required that result. *Id.*, at *1. A year and a half later, a panel of the Fifth Circuit ran through the *Thunder Basin* factors and affirmed. 969 F. 3d 507 (2020). A year and a half after that, the en banc Fifth Circuit took another look and largely reversed. 20 F. 4th 194 (2021). Now, more than four years after Ms. Cochran filed her complaint, this Court balances the *Thunder Basin* factors anew and holds that her case belonged in district court all along. *Ante*, at

17–18. For its part, Axon has endured a similarly tortuous path. Over the course of three years, the district court dismissed its case, 452 F. Supp. 3d 882 (Ariz. 2020), and the court of appeals affirmed, 986 F. 3d 1173 (CA9 2021), only to have this Court reverse that judgment today.

This is what a *win* looks like under *Thunder Basin*. When you replace clear jurisdictional rules with a jumble of factors, the room for disagreement grows. The incentive to litigate increases. Years and fortunes are lost just figuring out where a case belongs. Ms. Cochran and Axon have already endured multi-year odysseys through the entire federal judicial system—and no judge yet has breathed a word about the merits of their claims. Nor can I fault the district court in Ms. Cochran's case, or all of the lower courts in Axon's case, for thinking the *Thunder Basin* factors required dismissal. When we give our lower-court colleagues such confused instructions, we guarantee different courts will regularly reach different outcomes on the same facts.

Maybe even worse is what *Thunder Basin* means for others. Not many possess the perseverance of Ms. Cochran and Axon. The cost, time, and uncertainty associated with litigating a raft of opaque jurisdictional factors will deter many people from even trying to reach the court of law to which they are entitled. Nor is the loss of a day in court in favor of one before an agency a small thing. Agencies like the SEC and FTC combine the functions of investigator, prosecutor, and judge under one roof. They employ relaxed rules of procedure and evidence—rules they make for themselves. The numbers reveal just how tilted this game is. From 2010 to 2015, the SEC won 90% of its contested in-house proceedings compared to 69% of the cases it brought in federal court. See G. Mark, Response: SEC Enforcement Discretion, 94 Texas L. Rev. 261, 262 (2016). Meanwhile, some say the FTC has not lost an in-house proceeding in 25 years. See Brief for Petitioner in No. 21–86, p. 47. But see Brief for American Antitrust Institute as *Amicus Curiae* in

No. 21–86, p. 18 (suggesting the FTC has won more like 90% of the time).

That review is available in a court of appeals *after* an agency completes its work hardly makes up for a day in court *before* an agency says it's done.  When a case eventually makes its way to an appellate court, judges sometimes defer to the agency's conclusions (especially when it comes to disputed questions of fact).  And how many people can afford to carry a case that far anyway?  Ms. Cochran's administrative proceedings have already dragged on for *seven years*.  Thanks in part to these realities, the bulk of agency cases settle.  See *Tilton* v. *SEC*, 824 F. 3d 276, 298, n. 5 (CA2 2016) (Droney, J., dissenting) ("vast majority" of SEC cases settle); Tr. of Oral Arg. in No. 21–1239, p. 6 ("more than 90 percent" of such cases settle).  Aware, too, that few can outlast or outspend the federal government, agencies sometimes use this as leverage to extract settlement terms they could not lawfully obtain any other way.[4]  Like any needlessly unclear jurisdictional test, *Thunder Basin* carries with it real costs—for individuals seeking to vindicate their rights, for lower courts who deserve better guidance, and for our legal system's promise of a "just, speedy, and inexpensive determination of every" case, Fed. Rule Civ. Proc. 1.

\*

When Congress withholds jurisdiction, we must respect its choice.  But when Congress grants jurisdiction to the Nation's courts, we must respect that choice too.  We have no authority to froth plain statutory text with factors of our

---

[4] See P. Hamburger, Purchasing Submission: Conditions, Power, and Freedom 223 (2021) (describing this as "regulatory extortion"); D. Ginsburg & J. Wright, Antitrust Settlement: The Culture of Consent, in 1 W. Kovacic: An Antitrust Tribute 177 (N. Charbit et al. eds. 2013) ("Consent decrees create potential for an enforcement agency to extract from parties under investigation commitments well beyond what the agency could obtain in litigation").

own design, all with an eye to denying some people the day in court the law promises them.  Respectfully, this Court should be done with the *Thunder Basin* project.  I hope it will be soon.